## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

-------------------------------------------------x

Sonia Curbelo,

                Plaintiff,                   **COMPLAINT**

      v.

                                 Case No.

United States of America,

                Defendant.

-------------------------------------------------x

Plaintiff Sonia Curbelo, by and through her attorneys, The Jacob D. Fuchsberg Law Firm, LLP and Untiedt Dabdoub, PLLC, for her Complaint against Defendant as above captioned, brings claims and alleges as follows upon information and belief:

## **INTRODUCTION**

1.    From around July 2020 through August 2021, Plaintiff Sonia Curbelo (hereinafter "Plaintiff" or "Ms. Curbelo") was groomed, harassed, and sexually abused by a correctional officer, Antoine J. Hand (hereinafter "Officer Hand"), a former correctional officer at Federal Correctional Institute, Tallahassee (hereinafter "FCI Tallahassee"). Officer Hand used the power, resources, and authority that he had as a correctional officer assigned to patrol Ms. Curbelo's housing unit to sexually

abuse and eventually rape Ms. Curbelo on multiple occasions, while she was incarcerated in the custody of the United States Bureau of Prisons (hereinafter "BOP").

2.      Officer Hand was not the only BOP officer who sexually abused Ms. Curbelo at FCI Tallahassee, an all-female, low-security federal prison. She was also sexually abused by Lenton Jerome Hatten (hereinafter "Officer Hatten"), a former sports specialist or correctional officer at FCI Tallahassee who used his position and authority to stalk, sexually abuse, harass, assault, and/or rape at least 11 women who were incarcerated at FCI Tallahassee while he was employed there.

3.      Around February or March 2022, Ms. Curbelo began working in the recreation department (colloquially known as "rec") as a clerk, which put her in frequent contact with Officer Hatten as her supervisor. Similarly to Officer Hand, over time, Officer Hatten groomed, manipulated, and coerced Ms. Curbelo into sexual submission, using the power and resources he had at his disposal as a correctional officer as well as a sports specialist who supervised prisoners who worked in rec, including Ms. Curbelo.

4.      Instead of protecting the women who were under their care and control, Officer Hand and Officer Hatten were allowed and emboldened by BOP to prey upon them. It is extraordinary that over the two years that Ms. Curbelo was incarcerated

at FCI Tallahassee, from about July 2020 through about December 2022, she was repeatedly sexually assaulted by two different correctional officers.

5.     Officer Hand's sexual predation of Ms. Curbelo was obvious and apparent to other BOP staff who would observe their interaction. Within a month of Ms. Curbelo's arrival at FCI Tallahassee, in or around August 2020, Officer Hand began flirting with her, making personal and sexual comments, like how she reminded him of a woman that he was previously interested in. When Ms. Curbelo was transferred to a different housing unit, Officer Hand would "bid" to move his post to Ms. Curbelo's unit for overnight shifts when fewer officers would be around. These suspicious transfers happened at least twice, once in the fall of 2020 when Ms. Curbelo was moved to the A unit and again in the spring of 2021 when she was moved to the D unit to participate in the Residential Drug Abuse Program (hereinafter "RDAP"). Officer Hand first began touching Ms. Curbelo's body in the A unit. Officer Hand also began to gift Ms. Curbelo with various items that were not otherwise available at FCI Tallahassee, such as fast food.

6.     Upon information and belief, there was at least one other prisoner, besides Ms. Curbelo, who Officer Hand was openly grooming and sexually harassing at the time. Despite Officer Hand's constant abnormal interactions with certain women, including Ms. Curbelo, other BOP staff, including the unit officers, did not intervene to investigate or stop Officer Hand's conduct.

7.    Emboldened by other BOP staff's negligence or willful blindness, in the summer of 2021, Officer Hand proceeded to rape and sexually assault Ms. Curbelo in the D unit on about four separate occasions. For two of the four assaults, Officer Hand entered Ms. Curbelo's cell during nighttime and gave her oral sex and/or had vaginal intercourse with her. Upon information and belief, BOP protocols prohibit one-on-one interaction between prisoners and staff inside the cells, as security cameras do not capture the interior of most cells. If officers must enter a cell for inspection or other reasons, they must first have the prisoners exit the cell and stand outside. Even though BOP staff should have noticed Officer Hand repeatedly disappearing into Ms. Curbelo's cell during nighttime, they took no action to protect Ms. Curbelo. Further emboldened by the BOP's inaction, Officer Hand made Ms. Curbelo perform oral sex on him and/or had vaginal intercourse with her in the TV room within the housing unit. The TV room was in an open area where other people could walk in, showing Officer Hand's confidence that he could act with impunity.

8.    Officer Hand only stopped his sexual assaults of Ms. Curbelo because another prisoner directly witnessed this last rape in the TV room and reported it to BOP. Ms. Curbelo was interviewed by Special Investigative Services (hereinafter "SIS") Lieutenant FNU Mason (hereinafter "Lieutenant Mason"). Ms. Curbelo believed that she would be blamed, punished, and removed from the RDAP program if she were to admit to having had sexual intercourses with Officer Hand.

Completing RDAP is a way of obtaining good time credit and therefore early release from custody, which Ms. Curbelo knew. Lieutenant Mason told her that if she reported sexual abuse, she needed to be put in the special housing unit (hereinafter "SHU") for "investigation," which she knew would take her out of the RDAP program. She begged Lieutenant Mason not to send her to the SHU, to just let her stay in RDAP. At the time, Ms. Curbelo also did not want Officer Hand to be prosecuted. She only later realized, through therapy after being released from custody, that Officer Hand was a predator who had manipulated and used her for sex when she was in a vulnerable state without a true ability to consent.

9.    Even though Ms. Curbelo did not report Officer Hand's assaults to BOP, upon information and belief, he remains under ongoing investigation for sexually abusing at least two women including Ms. Curbelo. However, he remains employed by the BOP. Upon information and belief, shortly after his last rape of Ms. Curbelo, Officer Hand was transferred to a male facility.

10.    During relevant times, Officer Hand's recurrent sexual abuse of incarcerated persons, including Ms. Curbelo, was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hand's employment at FCI Tallahassee, BOP

personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hand.

11.    BOP's investigation into Officer Hand's sexual assaults of Ms. Curbelo remains ongoing as of the present date. This shows that, despite Ms. Curbelo's initial denial, there was sufficient objective evidence of the sexual assaults in BOP's possession. Nonetheless, BOP failed to protect Ms. Curbelo from falling victim to another sexual predator in uniform, Officer Hatten.

12.    Officer Hatten, as a sports specialist, personally oversaw and frequently interacted with women who were working in rec. Before Ms. Curbelo began to work in rec in or around March 2022, Officer Hatten had sexually assaulted and/or raped several women, many of whom worked in rec. He had an apparent *modus operandi* that was known to other BOP staff where he would isolate himself with female prisoners in the recreation shack (hereinafter "rec shack"), which is a small shed located in the far back of the recreational yard (hereinafter "rec yard"). There was no security camera inside the rec shack; there was one at the entrance that would reportedly capture in real time who arrived and left the rec shack, but not what occurred inside. Officer Hatten had a key to the rec shack, and could lock prisoners inside as he desired. Other isolated areas within FCI Tallahassee without security cameras where Officer Hatten would spend time alone with prisoners included the second floor of a recreational building (which is a separate building from the rec

shack), commonly known as "upstairs rec." Even though BOP staff should have noticed Officer Hatten's recurrent behavior of locking prisoners into an enclosed space alone with him, nothing was done to stop his suspicious behavior.

13.    One of the primary reasons Officer Hatten was able to continue abusing women, including Ms. Curbelo, is because his fellow officers did not follow the operating protocols by sharing supervisory duties with him. Upon information and belief, two officers are required to be present during shifts to jointly supervise prisoners who work in rec. Therefore, Officer Hatten should never have been alone with prisoners. However, BOP staff would frequently leave Officer Hatten to supervise prisoners by himself, including behind locked doors. Officer Hatten took advantage of his fellow officers' dereliction of duties to accost, isolate, imprison, harass, abuse, assault, and rape women right under the eyes of the BOP.

14.    Suspicions and allegations of Officer Hatten's sexual abuse abounded at FCI Tallahassee by the end of 2020, as many BOP employees saw, knew of, and disregarded Officer Hatten's suspicious interactions with incarcerated persons, some of which amounted to flagrant violations of FCI Tallahassee's security or operating protocols. For example, it was widely known throughout FCI Tallahassee that Officer Hatten would frequently lock another victim of his, Bonnie Hernandez (hereinafter "Ms. Hernandez"), inside the rec shack and sexually assault her there. Nevertheless, until August 2022, Officer Hatten continued to work as a sports

specialist and/or correctional officer at FCI Tallahassee with the willful ignorance and tacit approval of his colleagues and/or supervisors, leaving countless victims in his wake, including Ms. Curbelo who was assaulted using similar methods as Ms. Hernandez.

15.    After Plaintiff Ms. Curbelo began to work as a rec clerk in or around March 2022, Officer Hatten quickly found opportunities to spend time alone with her in the rec shack. On several occasions in the spring of 2022, Officer Hatten forcibly grabbed or fondled Ms. Curbelo's breasts, thigh, and/or buttocks over her clothes. During one of these incidents, he also intentionally pushed his erect penis against her body. Ms. Curbelo felt extremely uncomfortable with these touches, but given her prior experience with Officer Hand, she believed that this was unavoidable at FCI Tallahassee. She did not want to lose her job or go to the SHU, which she reasonably believed would happen if she tried to report Officer Hatten.

16.    Officer Hand as well as Officer Hatten's blatant sexual abuse, both of which was widely known throughout the facility and yet condoned until their respective departure from FCI Tallahassee, indicated to Ms. Curbelo the rape culture at FCI Tallahassee and BOP staff's willful blindness to it.

17.    Officer Hatten continued to escalate his sexual abuse of Ms. Curbelo over the ensuing months. He began to lock the rec shack door while Ms. Curbelo and he were inside, spending uninterrupted time alone with her. It is highly unusual

for a prisoner and an officer to spend time alone in the rec shack with no one else around. Other BOP officers, including the recreational officers, should have known that Ms. Curbelo being locked into the rec shack with Officer Hatten was abnormal, and yet did nothing to intervene or investigate.

18.    In or around June 2022, Officer Hatten locked Ms. Curbelo in the rec shack and groped her vagina under her clothes and underwear. On or around July 4, 2022, he again locked Ms. Curbelo alone in the rec shack and proceeded to grope her vagina. This time, he inserted his finger into her vagina.

19.    After the digital rape on or around July 4, 2022, Officer Hatten continued to take every opportunity to sexually harass Ms. Curbelo and make sexually explicit comments to her. Ms. Curbelo begged him to stop multiple times, but he did not listen. When she would avoid going to the rec shack, he would come to her housing unit to loudly call out her name, threatening to fire her. Other BOP staff, including Ms. Curbelo's unit team, did not intervene to stop Officer Hatten's inappropriate threats towards Ms. Curbelo. Officer Hatten was allowed unfettered access to Ms. Curbelo until August 2022, when Officer Hatten decided to resign amid a criminal investigation that was initiated by one of his other victims, Ms. Hernandez.

20.    On April 4, 2023, Officer Hatten was indicted for his sexual abuse of Ms. Hernandez, which was in violation of 18 U.S.C. § 2243(b). He quickly pled

guilty on May 25, 2023, admitting in a statement of facts accompanying his plea agreement that he had engaged in sexual relationship between October 2021 and August 2022 with Ms. Hernandez. He was sentenced to three months of incarceration and five years of supervised release on August 24, 2023. *See United States v. Hatten,* No. 4:23-cr-18 (RH) (MAF) (N.D. Fl.). If the case had proceeded to trial, the Government would have proven beyond a reasonable doubt that Officer Hatten had used FCI Tallahassee as his playground, systematically grooming, manipulating, preying upon, and repeatedly raping Ms. Hernandez.

21.    Prior to Officer Hatten's guilty plea on May 25, 2023, United States had in its possession several other victims' claims of abuse against Officer Hatten including Plaintiff Ms. Curbelo's torts claim form. The extent to which these claims were investigated by the Government is unclear. Ms. Curbelo did not receive any update regarding the status of investigation to date. Officer Hatten has not been criminally charged with any additional count.

22.    The Department of Justice (hereinafter "DOJ")'s refusal to prosecute BOP officers for sexual abuse is a well-known phenomenon. In another federal prison in Florida, Federal Correctional Coleman, there were at least six BOP officers who admitted in sworn statements to have sexually abused at least 10 female

prisoners. DOJ's Office of the Inspector General (hereinafter "OIG") declined to investigate or prosecute any of these officers.[1]

23.    During relevant times, Officer Hatten's recurrent sexual abuse of incarcerated persons, including Ms. Curbelo, was obvious to various agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee. Throughout Officer Hatten's employment at FCI Tallahassee until his resignation in or around August 2022, BOP personnel deliberately ignored alarming warning signs and sex abuse allegations against Officer Hatten.

24.    With both Officer Hand and Officer Hatten, Ms. Curbelo suffered sexual abuse in silence, lest she was retaliated against or deprived of the modest privileges she had as an incarcerated individual. Such reluctance to report is a common pattern among victims of prison sexual abuse. During relevant times, Officer Hand and Officer Hatten exercised complete dominion and power over her as correctional officers, as they had the key to her cell and control over her prison job, safety, health, welfare, and contact with the outside world. Other BOP officers

---

[1] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 3.

who knew or should have known about Officer Hand and Officer Hatten's sexual abuse permitted, condoned, or acquiesced to their misconduct, amplifying the Plaintiff's fear of retaliation and sense of hopelessness. Plaintiff only felt comfortable seeking legal counsel and reporting sexual abuse when she was released from BOP custody and then from the halfway house in or around March 2023.

25.    It was apparent to Ms. Curbelo and other victims incarcerated at FCI Tallahassee that BOP personnel would not intervene to prevent correctional officers from sexually assaulting prisoners, let alone adequately discipline, supervise, or reprimand them in accordance with BOP's purported zero-tolerance policy against suspected staff sex abuse on prisoners. Upon information and belief, before Officer Hand began to rape Ms. Curbelo, BOP employees were aware that he was engaging in inappropriate sexual and/or flirtatious interactions with his victims including Ms. Curbelo. Similarly, before Ms. Curbelo began to work in rec, BOP employees were aware that Officer Hatten was spending time alone with female prisoners in the rec shack behind the locked door. Officer Hand and Officer Hatten's highly abnormal behavior continued unchecked throughout their respective tenure at FCI Tallahassee, with the acquiescence of other BOP officers acting within the course and scope of their employment.

26.    Both Officer Hand and Officer Hatten interacted with female prisoners in blind spots within FCI Tallahassee that were not captured by security cameras,

contrary to the existing protocols. BOP personnel who were tasked with monitoring security cameras knew that Officer Hand and Officer Hatten often interacted with incarcerated persons in these blind spots and stayed there for lengthy periods of time for no apparent reason. There was no intervention to correct this.

27.    Both Officer Hand and Officer Hatten brought contraband into FCI Tallahassee and used them as part of their *modus operandi* in sexual abuse. They knew and exploited how valuable contraband, such as outside food, is in prison, further trapping their victims psychologically as well as exposing them to a threat of punishment for possessing contrabands if they were to report him. BOP personnel who were tasked with inspecting prisoners' cells or personal effects knew that Ms. Curbelo had certain items that must have been brought in from the outside. There was no intervention to correct or investigate this.

28.    It was only through the deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel, as well as the abject systemic failures at FCI Tallahassee and BOP, that Officer Hand and Officer Hatten's sexual abuse of Ms. Curbelo was able to occur and could continue unabated until they were each removed from FCI Tallahassee due to other prisoners' reports.

29.    As a result of the forementioned deliberate indifference, recklessness, carelessness, gross negligence, and negligence of other BOP personnel as well as

systemic failures at FCI Tallahassee, Plaintiff Ms. Curbelo was forced to engage in recurrent sexual encounters with Officer Hand and then with Officer Hatten by threats of force or coercion. Starting with sexual comments, grooming, and groping from around August 2020 onward, Officer Hand's abuse eventually developed into multiple oral and/or vaginal rapes between approximately June 2021 and August 2021. Even though Ms. Curbelo escaped this abuse by another prisoner's report, Officer Hatten began sexually harassing her in or around March 2022 when she began to work in the rec shack. After several incidents of forcible groping, Officer Hatten eventually touched Ms. Curbelo's vagina under her clothes in or around June 2022. On or around July 4, 2022, shortly before he resigned, Officer Hatten digitally penetrated Ms. Curbelo's vagina.

30.    As shown by the above chronology, with the benefit of willful blindness and/or negligence of his coworkers, both Officer Hand and Officer Hatten became increasingly bold, aggressive, and threatening over time, using FCI Tallahassee as their personal sexual playground.

31.    As a prisoner under Officer Hand and Officer Hatten's custodial, supervisory, and disciplinary authority, Ms. Curbelo did not have a meaningful escape from either of their predatory conduct. She felt that she had no choice but to comply with their abusive demands. She knew that they could take away her privileges, job, outside contact, or even put her in the SHU, thereby lengthening her

prison sentence. She also feared that she would suffer these consequences by reporting Officer Hand and/or Officer Hatten.

32.    Indeed, this fear was proven true. It was widely known among prisoners that after reporting Officer Hatten, Ms. Hernandez was placed in the SHU for "investigation," which further deterred other victims including Ms. Curbelo from reporting Officer Hatten while in custody. Even after Ms. Hernandez took it upon herself to report Officer Hatten, the Government failed to explore the severity, frequency, and magnitude of Officer Hatten's abuse fully or accurately during his criminal proceeding, resulting in a mere 3-month sentence that does not begin to capture the egregious circumstances herein.

33.    Plaintiff Ms. Curbelo experienced catastrophic and unnecessary pain and suffering because of Defendant's egregious disregard for, and carelessness towards, Plaintiff's safety and well-being despite the myriad warning signs regarding Officer Hand and Officer Hatten's abhorrent conduct.

34.    Plaintiff brings this suit under the Federal Tort Claims Act (hereinafter "FTCA"), 28 U.S.C. §§ 2671, *et seq.*, in connection with the deficient supervision and custodial care provided to her by various BOP personnel within the scope of their employment with the BOP, which in turn resulted in Officer Hand and Officer Hatten's recurrent sexual abuse.

35.    Plaintiff seeks redress for Defendant's unlawful conduct, which caused her to suffer permanent and catastrophic injuries.

## JURISDICTION AND VENUE

36.    This Court has original subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1346(b)(1) as arising under the Constitution, laws, and/or treaties of the United States of America. Plaintiff's claims are predicated, in part, upon the FTCA, 28 U.S.C. §§ 2671, *et seq.*, authorizing actions seeking relief against the United States.

37.    This Court has personal jurisdiction because the alleged incidents occurred within the confines of the State of Florida.

38.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b), as a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within the boundaries of this District and Division, in the County of Leon.

## CONDITIONS PRECEDENT TO THIS LAWSUIT

39.    Plaintiff has properly complied with the requirements of 28 U.S.C. § 2675 by presenting an Administrative Claim against the United States of America, which provided the Government with adequate notice regarding Officer Hand and Officer Hatten's abusive conduct and other BOP personnel's negligence related

thereto. The Claim was timely filed with the BOP on or around April 10, 2023, within two (2) years of the accrual of the causes of action.

40.    On November 1, 2024, the BOP informed the undersigned counsel that the investigation concerning Officer Hatten had concluded at an unspecified time, but that the investigation concerning Officer Hand was still "ongoing" with no indication of when it "will conclude." As such, BOP received Ms. Curbelo's Administrative Claim but has failed to dispose of this Claim to date. Under 28 U.S.C. § 2675(a), BOP's failure "to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim." By the filing of this action, Plaintiff elects to deem BOP's lack of response within six months of filing as the final denial of Plaintiff's Administrative Claim in its entirety. Therefore, Plaintiff exhausted requisite administrative remedies under 28 U.S.C. §§ 2401(b) and 2675(a).

## **PARTIES**

### **Plaintiff**

41.    At all times relevant hereto, Plaintiff Ms. Curbelo was an adult prisoner in the custody of BOP, incarcerated in a Federal Correctional Institution located at 501 Capital Cir NE, Tallahassee, FL 32301, commonly known as FCI Tallahassee. Ms. Curbelo was released from FCI Tallahassee in or around December 2022. She currently resides in the State of North Carolina.

**Defendant**

42.    Defendant United States of America (hereinafter "United States") is the appropriate defendant for Plaintiff's claims under the FTCA. The United States is a sovereign entity that has waived its immunity for certain claims, including the claims set forth herein, and is liable for the acts or omissions of its agents, servants, contractors, and employees that occur within the scope of their employment.

43.    At all times relevant hereto, Defendant United States, acting through the BOP, was responsible for the operation, control, supervision, policy, practice, implementation, and conduct of all federal correctional matters including at FCI Tallahassee and was responsible for the hiring, retention, training, supervision, management, discipline, and conduct of all BOP personnel, including but not limited to Officer Hand and Officer Hatten.

44.    In addition, at all relevant times, Defendant United States was responsible for enforcing the rules of the BOP, and for ensuring that BOP personnel obey the Constitution and laws of the United States.

45.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hand, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

46.    At all times relevant hereto, Officer Hand was a unit officer, correctional officer, and/or an employee of BOP and Defendant United States. In his

capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hand was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

47.    At all times relevant hereto, Officer Hand's colleagues and supervisors, including other unit officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

48.    At all times relevant hereto, Officer Hand was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hand was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

49.    At all times relevant hereto, Officer Hand's colleagues and supervisors, including other unit officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency,

representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

50.    At all times relevant hereto, Defendant United States, acting through the BOP, hired Officer Hatten, as well as his colleagues and supervisors, to serve as "law enforcement officer" within the meaning of 28 U.S.C. § 2680(h).

51.    At all times relevant hereto, Officer Hatten was a sports specialist, recreational officer, correctional officer, and/or an employee of BOP and Defendant United States. In his capacity as an agent, servant, and employee of Defendant United States, and within the course and scope of his employment as such, Officer Hatten was responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

52.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also employees of BOP and Defendant United States. In their capacity as agents, servants, and employees of Defendant United States, and within the course and scope of their

employment as such, these officers were responsible for the day-to-day oversight, supervision, safekeeping, care, custody, control, direction, protection, safety, and well-being of people confined at FCI Tallahassee, including Plaintiff.

53.    At all times relevant hereto, Officer Hatten was an agent, representative, or employee of Defendant United States. At all times relevant hereto, Officer Hatten was the authorized agent, servant, or contractor of Defendant United States, acting with the permission, ratification, approval, and consent of Defendant United States.

54.    At all times relevant hereto, Officer Hatten's colleagues and supervisors, including other recreational officers and correctional officers, were also agents, representatives, or employees of Defendant United States. At all times relevant hereto, these officers acted within the course and scope of said agency, representation, or employment and were within the scope of their authority, whether actual or apparent. At all times relevant hereto, these officers were the authorized agents, partners, servants, or contractors of Defendant United States, and the acts and omissions herein alleged were done by these officers acting through such capacity, within the scope of their authority, with the permission, ratification, approval, and consent of Defendant United States.

## JURY DEMAND

55.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury on all issues and claims in this action that are so triable.

## FACTUAL BACKGROUND

## INDICATIONS AND WARNING SIGNS OF OFFICER HAND AND OFFICER HATTEN'S SEXUAL ABUSE

56.    Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 42 through 54 with the same force and effect as if fully set forth herein.

57.    Congress enacted the Prison Rape Elimination Act (hereinafter "PREA") in 2003, 34 U.S.C. §§ 30301, *et seq.* to establish national standards for preventing and responding to sexual abuse of prisoners. Pursuant to PREA, DOJ promulgated certain regulations, which remain binding on all BOP facilities, including FCI Tallahassee. *See* 28 C.F.R. § 115. Under PREA regulations, BOP is required to "train all employees who may have contact with inmates" on the following: its "zero-tolerance policy for sexual abuse and sexual harassment"; "the right of inmates to . . . be free from retaliation for reporting sexual abuse and sexual harassment"; "signs and dynamics of prison sexual abuse"; and "how to avoid inappropriate relationships with inmates." *Id.* § 115.31(a).

58.    In addition, BOP's policies titled "program statements" set forth rules and procedures that all BOP employees were required to follow during relevant time periods:

a. Program Statement 3420.11 (Standards of Employee Conduct) mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates."

b. Program Statement 3420.11 states that BOP employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with prisoners, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

c. Program Statement 3420.11 goes on to state that "[a]ll allegations of sexual abuse will be thoroughly investigated and, when appropriate, referred to authorities for prosecution."

d. Program Statement 5324.12 (Sexually Abusive Behavior Prevention and Intervention Program) implements a zero-tolerance policy toward all forms of staff-on-prisoner sexual abuse, including sexual harassment.

e. Program Statement 5324.12 mandates that "[a]ll staff must report information concerning incidents or possible incidents of sexual

abuse or sexual harassment to the Operations Lieutenant, or where

appropriate, in accordance with the Program Statement 3420.11."

59.    BOP policy requires training of all employees who may have contact

with prisoners on how to fulfill their responsibilities under these rules and

procedures.

60.    Upon information and belief, Officer Hand's employment at FCI

Tallahassee began in or around 2012.

61.    Throughout the time that Officer Hand worked as a unit officer and/or

correctional officer at FCI Tallahassee, from around 2012 through 2021, the warning

signs of his sexual abuse were or should have been obvious to other reasonable BOP

personnel. Especially while he was working as Ms. Curbelo's unit officer from

around July 2020 through around August 2021, his routines and *modus operandi* in

sexually abusing Ms. Curbelo involved flagrant violations of FCI Tallahassee's

security and operating protocols, which were and should have been obvious to other

BOP personnel.

62.    From at least 2019 onward, certain agents, servants, contractors, and

employees of BOP, including but not limited to unit managers, counselors,

correctional officers, lieutenants, department heads, captains, supervisors, and

executive staff, observed Officer Hand placing himself in posts where he would be

alone and unsupervised with prisoners. He would often work the "graveyard shift,"

which was from 10:00 PM to 6:00 AM, in women's housing units when other officers were not around.

63.    From at least 2019 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hand ingratiating himself with certain women by allowing them to circumvent BOP rules, such as curfew. They also observed Officer Hand spending substantial amounts of time alone with incarcerated women, typically in the "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hand frequently accompanied incarcerated women to these blind spots by himself.

64.    Officer Hand, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as inside the prison cells or the TV room. He repeatedly took advantage of these known blind spots to brutally abuse Ms. Curbelo, by raping her, forcing her to receive and perform oral sex, and fondling her body. Officer Hand would be so blatant as to lock himself inside Ms. Curbelo's cell at night to perform sexual acts on her and/or to rape her in the TV room in the open common area of the housing unit. Other BOP officers knew of, and disregarded, Officer Hand's abnormal behavior of repeatedly isolating himself with certain prisoners, including Ms. Curbelo.

65.    Officer Hand abused his authority and flaunted his power by providing Ms. Curbelo with certain benefits or promises of benefits. For example, he frequently brought contraband and gifts to Ms. Curbelo, which was or should have been obvious to other BOP personnel. Upon information and belief, there was at least one other woman to whom Officer Hand was giving similar preferential treatment. Had BOP personnel conducted the needed investigations into the benefits that these women, including Ms. Curbelo, had received from Officer Hand, they would have discovered and stopped his sexual abuse before he began to sexually assault Ms. Curbelo in the summer of 2021.

66.    Upon information and belief, Officer FNU Richardson ("Officer Richardson"), another correctional officer who was assigned to the same unit as Officer Hand, frequently worked night shifts that overlapped with Officer Hand's shifts and was friendly with him. Officer Richardson knew or should have known about the inappropriate relations between Officer Hand and Ms. Curbelo. Instead of accompanying and monitoring Officer Hand during his rounds pursuant to the BOP protocols, Officer Richardson allowed Officer Hand to groom Ms. Curbelo by letting her stay up past curfew, to bring her gifts, and to eventually have sexual intercourse with her within the housing unit. Officer Richardson knew or should have known about the indications and signs of Officer Hand's sexually abusive conduct. Nonetheless, Officer Richardson turned a blind eye and allowed Officer Hand

unfettered access to Ms. Curbelo. Upon information and belief, Officer Richardson himself was having inappropriate relations with another prisoner and was suspended or otherwise disciplined for it by the BOP.

67.    Upon information and belief, Officer Hatten's employment at FCI Tallahassee began in or around 2018.

68.    Prior to being placed in FCI Tallahassee, Officer Hatten worked at Marianna Camp, another female BOP facility that is located about an hour away from FCI Tallahassee in the State of Florida. Upon information and belief, BOP personnel at Marianna Camp were made aware of Officer Hatten giving commissary items and/or paying for phone minutes for certain women prisoners, which was a warning sign of inappropriate relations with prisoners, in contravention of BOP protocols. Knowing this, BOP still placed Officer Hatten in FCI Tallahassee, a female facility where he would have access to more victims.

69.    Throughout the time that Officer Hatten worked as a sports specialist and/or correctional officer at FCI Tallahassee, from around 2018 through August 2022, the warning signs of his perversion were ample and obvious to any reasonable BOP personnel. He utilized similar methods to stalk, assault, abuse, and terrorize at least 11 different victims incarcerated at FCI Tallahassee. His routines and *modus operandi* involved flagrant violations of FCI Tallahassee's security and operating protocols, which were and should have been obvious to other BOP personnel.

70.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten placing himself in posts where he would be alone and unsupervised with prisoners on their job details. For instance, he volunteered to supervise women working at rec when other officers were not around, and he also worked overtime in food services to supervise women working in the kitchen.

71.    From at least 2020 onward, certain agents, servants, contractors, and employees of BOP, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff, observed Officer Hatten spending substantial amounts of time alone with incarcerated women. They also observed him escorting certain women to various isolated areas within FCI Tallahassee, which were typically "blind spots" that were not captured by security cameras. There was no legitimate explanation as to why Officer Hatten frequently accompanied incarcerated women to these blind spots by himself.

72.    Officer Hatten, as a correctional officer, knew how to identify various blind spots that fell outside of the view of the security cameras, such as inside of the rec shack. He repeatedly took advantage of these known blind spots to brutally abuse

his victims, including Ms. Curbelo, by digitally penetrating their vaginas, demanding sexual favors, and/or fondling their body. Other BOP officers knew of, and disregarded, Officer Hatten's abnormal behavior of repeatedly isolating himself with certain prisoners and/or locking himself inside secluded structures with certain prisoners.

73.    Officer Hatten also abused his authority and flaunted his power by providing his victims with certain benefits or promises of benefits. For example, with the outbreak of COVID-19 in 2020, jobs at rec became highly sought-after positions because they allowed prisoners some movements outside of the housing units. Officer Hatten indicated, by word and/or action, that he would take Ms. Curbelo's job away if she did not comply with his demands. He would often appear at Ms. Curbelo's housing unit, loudly screaming at her to come to work and saying things like, "You can be replaced." Officer Hatten also frequently brought contraband and gifts to his victims, including Ms. Curbelo, which was or should have been obvious to other BOP personnel. Had BOP personnel conducted the needed investigations into the benefits that certain prisoners had received from Officer Hatten, they would have discovered and stopped his sexual abuse before he began to sexually assault Ms. Curbelo in 2022.

74.    At FCI Tallahassee, Officer Hatten quickly developed a widespread reputation among women prisoners for being a "pervert" who said and did

inappropriate things to them. This reputation was well known to other BOP personnel, including but not limited to unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, and executive staff.

75.    With the COVID-19 pandemic, Officer Hatten's sexual abuse escalated. For social distancing purposes, correctional officers including Officer Hatten were given more power to isolate prisoners and control the prisoners' movements throughout the facility. Officer Hatten used this power to isolate, terrorize, and abuse his victims at his will. In addition, with COVID-19, other officers, particularly those working in rec, were even less likely to oversee or intervene in Officer Hatten's suspicious conduct than before. Upon information and belief, some of the recreational officers would intentionally avoid being around Officer Hatten while supervising prisoners to maintain willful blindness towards his sexually abusive conduct, thereby placing vulnerable women at a further risk of sexual abuse.

76.    Upon information and belief, Officer Cornelius Jones ("Officer Jones"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jones allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jones knew or should have known that Officer Hatten was acting

inappropriately with certain women and/or bringing them contraband gifts. Nonetheless, Officer Jones turned a blind eye and allowed Officer Hatten unfettered access to his victims. Officer Jones himself was verbally abusive to prisoners, calling them "ugly," "fat," "bitch," or sexually degrading terms, supporting his dismissive attitude towards Officer Hatten's sexually abusive conduct.

77.    Upon information and belief, Officer Eric Love ("Officer Love"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Love allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Love knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Upon information and belief, Officer Love had witnessed a prior incident wherein another recreational officer at FCI Tallahassee, Jimmy Highsmith, had sexually abused a woman and was eventually convicted of that crime. Therefore, Officer Love knew or should have known the indications, signs, and concerns of Officer Hatten's sexually abusive conduct. Nonetheless, Officer Love turned a blind eye and allowed Officer Hatten unfettered access to his victims.

78.    Upon information and belief, Officer Larry Mitchell ("Officer Mitchell"), another correctional officer who was frequently assigned to recreation,

worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Mitchell allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Mitchell knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. Officer Mitchell also knew that Officer Hatten was locking certain women into the rec shack, in contravention of BOP protocols. Nonetheless, Officer Mitchell turned a blind eye and allowed Officer Hatten unfettered access to his victims.

79. Upon information and belief, Officer Nicole Lakoe Jackson ("Officer Jackson"), another correctional officer who was frequently assigned to recreation, worked hours that overlapped with Officer Hatten's shift. Instead of accompanying and monitoring Officer Hatten pursuant to the BOP protocols, Officer Jackson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself, and often personally sent prisoners to see Officer Hatten by themselves. Officer Jackson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them contraband gifts. In fact, around October 2021, Officer Jackson made a comment to one of Officer Hatten's other victims, Ms. Hernandez, that, "y'all need to go sit outside with y'all daddy," referring to Officer Hatten. Officer Jackson also knew that Officer Hatten

was locking certain women into the rec shack, in contravention of BOP protocols. Despite her apparent awareness of inappropriate relationships between Officer Hatten and certain women, Officer Jackson turned a blind eye and allowed Officer Hatten unfettered access to his victims.

80.    Upon information and belief, Officer Lee Adamson ("Officer Adamson"), was the recreation supervisor with authority over Officer Hatten as well as Officers Jones, Love, Mitchell, and Jackson. Instead of monitoring, supervising, and disciplining Officer Hatten pursuant to the BOP protocols, Officer Adamson allowed Officer Hatten to take women to various isolated locations, including the rec shack, by himself. Officer Adamson knew or should have known that Officer Hatten was acting inappropriately with certain women and/or bringing them gifts. Nonetheless, Officer Adamson turned a blind eye and allowed Officer Hatten unfettered access to his victims. Upon information and belief, Officer Adamson favored Officer Hatten over other recreational officers and condoned his inappropriate behavior, emboldening Officer Hatten to use the prison facility as his personal sexual playground. For example, Officer Adamson would give Officer Hatten the first chance at overtime assignments before other rec officers.

81.    In sum, given the overtness and frequency with which Officer Hand and/or Officer Hatten preyed upon women who were under their custody, other BOP personnel suspected or should have suspected that Officer Hand and/or Officer

Hatten were sexually abusing prisoners. Binding PREA regulations mandate staff reporting, whereby all BOP staff are required to "report immediately . . . **any knowledge, suspicion, or information** regarding an incident of sexual abuse or sexual harassment that occurred in a facility. . .; retaliation against inmates or staff who reported such an incident; and any staff neglect or violation of responsibilities that may have contributed to an incident or retaliation." 28 C.F.R. § 115.61(a). When an incarcerated person is subject to a substantial risk of imminent sexual abuse, BOP shall take immediate action to protect that person. *See* 28 C.F.R. § 115.62. In addition, administrative investigations of alleged sexual abuse by a staff member are required to proceed "promptly, thoroughly, and objectively for all allegations, including third-party and anonymous reports." *Id.* § 115.71(a). The presumptive disciplinary sanction for substantiated allegations of sexual abuse is termination. *See id.* § 115.76(b). Victims shall also be offered medical and mental health care by the BOP. *See id.* § 115.83.

82.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Richardson, Jones, Love, Mitchell, Jackson, and Adamson had numerous opportunities to follow the above-mentioned mandates and stop Officer Hand and/or Officer Hatten's misconduct. Both Officer Hand and Officer Hatten's actions were abnormal, obvious, and suspicious for sexual misconduct. In addition, upon information and belief, correctional officers in the

control room were charged with monitoring the security cameras and following up on any suspicious activities that they noticed on the cameras. These officers saw or should have seen that Officer Hand as well as Officer Hatten repeatedly disappeared into unmonitored areas with prisoners who were not authorized to be in those areas alone with an officer. Nevertheless, BOP personnel took no actions to investigate or stop Officer Hand and/or Officer Hatten's suspicious and recurrent behavior.

83.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Richardson, Jones, Love, Mitchell, Jackson, and Adamson failed to investigate, discipline, supervise, monitor, question, or stop Officer Hand and/or Officer Hatten despite numerous indications of their respective sexual misconduct. This was in direct violation of mandatory BOP policies, was not related to a discretionary function or duty, and served no plausible penological policy purpose.

84.    Defendant United States and its agents, servants, contractors, and employees including but not limited to Officers Richardson, Jones, Love, Mitchell, Jackson, and Adamson condoned, permitted, acquiesced to, consented to, and tacitly approved Officer Hand and/or Officer Hatten's longstanding abuse of prisoners. These officers' abuse of prisoners at FCI Tallahassee was so widely known throughout the prison that the staff turned it into a running joke. Instead of following protocols to protect the prisoners in their care, the prison staff sat around making

jokes at their expense. Their actions – and inactions – allowed Officer Hand and/or Officer Hatten to rape and/or abuse women with impunity.

85.   Before Officer Hand orally and vaginally raped Ms. Curbelo in or around the summer of 2021, and before Officer Hatten digitally raped Ms. Curbelo in or around the summer of 2022, agents, servants, contractors, and employees of BOP, including at least some of the unit managers, counselors, correctional officers, lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators at FCI Tallahassee, were aware of suspicions, indications, or concerns regarding each Officer's sexual misconduct. They were aware of Officer Hand and/or Officer Hatten's frequent protocol violations and unexplained suspicious interactions with certain prisoners, including Ms. Curbelo. Nonetheless, they refused to take the required action to report, monitor, supervise, or investigate Officer Hand and/or Officer Hatten.

86.   It is extraordinary and inexplicable that Defendant United States continued to allow Officer Hand and Officer Hatten to spend time alone with female prisoners in isolation, creating daily opportunities for each of them to commit additional sexual assaults.

87.   The fact that Officer Hand and Officer Hatten could get away with sexual abuse while flagrantly violating BOP's policies led their victims, including the Plaintiff, to believe that they were untouchable. Ms. Curbelo had legitimate

concerns that she would suffer retaliation or other substantial harm if she were to report Officer Hand and/or Officer Hatten's assaults, such as being removed from the RDAP program, put in the SHU, fired from her job, and/or transferred to a different facility. To further fuel this fear and ensure her silence, Officer Hatten verbally threatened Ms. Curbelo, reminding her that he had the power over her as an officer.

88.    BOP personnel at FCI Tallahassee, including lieutenants, department heads, captains, supervisors, executive staff, associate wardens, wardens, and investigators, knew Officer Hand and/or Officer Hatten's reputations as sexual predators. They also knew that female prisoners are reluctant to come forward with information regarding staff sexual abuse for fear of reprisal and loss of work privileges. Despite these known issues, FCI Tallahassee granted Officer Hand and/or Officer Hatten unrestricted and unsupervised contact with numerous women, emboldening each of them to abuse their position of authority to coerce, violate, and assault their victims, including Ms. Curbelo.

## HISTORY OF SEXUAL ABUSE AT FCI TALLAHASSEE – "DEN OF DESPAIR"

89.    FCI Tallahassee has a long and sordid history of sexual abuse within its facility by correctional officers against the prisoners whom they were duty-bound to protect.

90.    The facility first gained notoriety in 2006 when there was a shoot-out between a correctional officer and Federal Bureau of Investigation ("FBI") agents that led to the death of two people. In that case, the FBI was present to investigate and arrest six guards for sexually abusing the female prisoners in their custody.[2]

91.    FCI Tallahassee has one of the highest rates of staff-on-prisoner abuse complaints in the country, receiving more than 130 complaints since 2012.[3] It is highly likely that the problem is even more widespread than this figure suggests, but it goes largely unchecked, because of cultural tolerance, cover-ups, and organizational reprisals against prisoners who dare to report staff abuse.

92.    Physician assistant Paul Rolston is alleged to have sexually abused numerous women under his care in FCI Tallahassee beginning in around 2018. Despite several civil complaints filed against PA Rolston, instead of firing this serial abuser, FCI Tallahassee simply transferred him to a male facility, continuing the cycle of silence and abuse at FCI Tallahassee and further perpetuating the environment that protected the abusers at the cost of vulnerable women.[4] Upon information and belief, Officer Hand was also transferred to a male facility instead

[2] *2 federal employees die in Fla. prison shooting*, NBC News, June 21, 2006 at 9:23 AM, https://www.nbcnews.com/id/wbna13415618
[3] Silja J.A. Talvi, *WOMEN REPORT 'RAMPANT' SEXUAL ABUSE AT FEDERAL PRISON WHERE GHISLAINE MAXWELL IS HELD*, The Appeal, Apr 25, 2023, https://theappeal.org/fci-tallahassee-sexual-abuse-women-prison-ghislaine-maxwell/
[4] *Id.*

of being fired, despite credible reports regarding his sexual assault including that of Ms. Curbelo.

93.    In August 2021, Officer Phillip Golightly was sentenced to 24-months' imprisonment for sexually abusing female prisoners in his care.[5] Even though Officer Golightly was indicted for, and pled guilty to, sexual abuse of only one victim, additional victims who suffered sexual abuse by Officer Golightly were acknowledged as part of the court records.[6] Upon information and belief, Officer Hatten and Officer Golightly, a convicted sexual abuser, were friendly with each other and knew about each other's sexually abusive conduct. In the same way that Officer Hatten summonsed his victims to the isolated rec shack, Officer Golightly called his victims to food services to sexually assault them, even though they did not even work in food services.

94.    In December 2021, another former recreational specialist at FCI Tallahassee, Officer Jimmy Highsmith, was found guilty by a jury of sexually abusing a prisoner.[7] Upon information and belief, numerous complaints were filed

---

[5] *Former Bureau of Prisons Correctional Officer Sentenced to 24 Months In Federal Prison For Sexually Abusing Prisoners*, Press Release U.S. Attorney's Office, Northern District of Florida, Aug. 27, 2021, https://www.justice.gov/usao-ndfl/pr/former-bureau-prisons-correctional-officer-sentenced-24-months-federal-prison-sexually.
[6] *Id*.
[7] *Jury Convicts Former Tallahassee Federal Correctional Officer Of Sexual Abuse of Prisoner*, Press Release U.S. Attorney's Office, Northern District of Florida, Dec. 17, 2021, https://www.justice.gov/usao-ndfl/pr/jury-convicts-former-tallahassee-federal-correctional-officer-sexual-abuse-inmate.

against Officer Highsmith by women at FCI Tallahassee beginning around 2014, and yet BOP personnel at FCI Tallahassee ignored these complaints to keep him employed as a supervisor for women working in rec—same as in Officer Hatten's case.

95.    There are many similarities in *modus operandi* of Officers Golightly, Highsmith, Hand, and Hatten's sexual abuse, including taking women to off-camera areas by themselves and/or using their jobs as a basis for sexual coercion. Therefore, BOP personnel at FCI Tallahassee, including but not limited to recreational officers, unit officers, unit team, supervisors, executive staff, and investigators, knew or should have known that Officer Hand and/or Officer Hatten's conduct was highly indicative of sexual abuse. Nonetheless, BOP personnel violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility."

96.    BOP personnel's reckless disregard of the safety and welfare of victims including Plaintiff Ms. Curbelo is highlighted by the fact that multiple correctional officers were sexually assaulting women incarcerated at FCI Tallahassee throughout the relevant times. Officer Hand and/or Officer Hatten fed into, and were also encouraged and enabled by, this toxic culture at FCI Tallahassee.

97.     Despite BOP's purported zero-tolerance policy, sexual abuse of incarcerated people is an issue endemic to BOP, beyond FCI Tallahassee as well. In 2022, the U.S. Senate Permanent Subcommittee on Investigations issued a report (hereinafter "the PSI Report"), which found that over the past decade, BOP employees sexually abused female prisoners in at least two-thirds of federal prisons that have held women (19 out of 29 facilities). The PSI Report found that Defendant United States' management failures enabled continued sexual abuse of incarcerated people by BOP personnel. The PSI Report specifically found that the United States, through BOP, "failed to detect, prevent, and respond to sexual abuse of female prisoners in its custody."[8]

98.     Despite this established history of sexual abuse in BOP custody and at FCI Tallahassee specifically, Defendant United States failed to institute a reliable practice for detecting and stopping sexual abuse of incarcerated people. As a telling example, FCI Tallahassee's PREA audit reports that were published on or around July 6, 2021, and July 4, 2023, claimed that FCI Tallahassee was compliant with all PREA standards. Even though this audit report was published after PA Rolston and Officers Golightly, Highsmith, and Hatten's sexual abuse became public through

---

[8] S. PERMANENT SUBCOMM. ON INVESTIGATIONS, REP. ON SEXUAL ABUSE OF FEMALE INMATES IN FEDERAL PRISONS, 18 (Dec. 13, 2022), https://www.ossoff.senate.gov/wp-content/uploads/2022/12/PSI-Embargoed-Staff-Report-re-Sexual-Abuse-of-Female-Inmates-in-Federal-Prisons.pdf at 4.

criminal investigation, this obvious non-compliance with PREA standards cannot be found anywhere in the reports. This blatant deficiency reflects the culture of Defendant United States of turning a blind eye to sexual abuse of people incarcerated in BOP custody.

99.    Based on the history of sexual abuse at FCI Tallahassee, Defendant United States had actual notice and knowledge that correctional officers could abuse their position of power to sexually assault prisoners, including in off-camera areas.

100.    Nevertheless, Defendant United States failed to take adequate steps to prevent Officer Hand and/or Officer Hatten from engaging in recurrent sexual abuse, including by installing additional security cameras to eliminate the blind spots. This was in direct violation of mandatory and non-discretionary BOP policies, which required that BOP staff eliminate any known blind spots and install sufficient video monitoring to prevent sexual abuse.

101.    Upon information and belief, from around 2018 through at least August 2021, Officer Hand sexually abused women in his custody at FCI Tallahassee. Other than Ms. Curbelo, at least one other woman reported Officer Hand's abuse to the BOP and/or FBI and other external investigative agencies.

102.    Upon information and belief, from around August 2019 through July 2022, Officer Hatten sexually abused numerous women in his custody at FCI Tallahassee. Other than Ms. Curbelo, ten (10) additional women have reported

Officer Hatten's abuse to the BOP and/or FBI and other external investigative agencies.

103.   Defendant United States and its agents, servants, contractors, and employees failed to remedy the culture of staff sexual abuse at FCI Tallahassee before, during, and after Officer Hand and Officer Hatten's respective abuse of the Plaintiff.

## OFFICER HAND's SEXUAL ABUSE OF PLAINTIFF

104.   Ms. Curbelo first arrived at FCI Tallahassee in or around July 2020 at around 36 years of age and remained incarcerated there until around December 2022 when she was released from BOP custody.

105.   Throughout this time, Ms. Curbelo was under the custodial care, supervision, and control of the agents, servants, employees, and independent contractors of Defendant United States and/or BOP, including Officer Hand, Officer Hatten, and other officers at FCI Tallahassee whose identities are not presently known. As a matter of both federal and state law, Defendant United States had an absolute non-delegable duty to see that prisoners in its custody receive adequate custodial care and supervision; to maintain the safety, health, and well-being of the prisoner population; and to prevent prisoners such as Ms. Curbelo from being subjected to undue harm and/or cruel and unusual punishment. Defendant United States abjectly failed to carry out these duties.

106.   Upon her arrival at FCI Tallahassee in or around July 2020, Ms. Curbelo was placed in quarantine for about 21 days due to COVID-19 pandemic. After the quarantine, she was housed in the C unit, where she first encountered Officer Hand.

107.   Regardless of which unit he worked at, Officer Hand would always work the graveyard shift, which was from 10:00 PM to 6:00 AM. Even though two officers are normally required to be present to patrol a housing unit, during the graveyard shift, Officer Hand would frequently be the only officer on the floor, overseeing dozens of women by himself. It is unclear where his colleagues such as Officer Richardson were during these times.

108.   The very first time that Ms. Curbelo interacted with Officer Hand, he caught her watching TV without getting ready for the "count" time and threatened to write her up. Count is when officers go around each cell making sure that everyone is accounted for. Based on this initial interaction, even though Officer Hand was mostly friendly and nice during the subsequent encounters, Ms. Curbelo always knew that he held power over her.

109.   From the outset, Officer Hand groomed Ms. Curbelo by telling her personal things about him, like his marital status or how she reminded him of another woman that he was previously interested in while he was in the military. BOP protocols expressly prohibit these personal interactions between officer and prisoner, as they can lead to inappropriate relations and/or preferential treatment.

110.    When Ms. Curbelo was transferred to the A unit in or around September or October 2020, Officer Hand also bid to work there during the graveyard shift. He would do rounds by himself and often spend time alone with Ms. Curbelo. Officer Hand continued to groom Ms. Curbelo by giving her certain benefits. Ms. Curbelo noticed that Officer Hand would allow certain women, including herself, to stay up past curfew and keep the TV on to finish the shows they enjoyed. These small privileges meant a lot in the prison, and Ms. Curbelo knew that she had to be "nice" to him to keep these privileges.

111.    When Ms. Curbelo stayed up past curfew, Officer Hand also took that opportunity to sexually harass her in private while other prisoners were asleep. In or around January 2021, Officer Hand initiated physical contact by touching Ms. Curbelo's buttocks while they were in her cell in the A unit. When they spent time together, Officer Hand repeatedly promised to help her out financially after she was released from custody and encouraged her to come visit him in Florida. Ms. Curbelo was in a vulnerable position and believed these promises.

112.    Sometime in or around the spring of 2021, Ms. Curbelo was enrolled in the RDAP program, which mandated her transfer to the D unit. Upon information and belief, even though Officer Hand normally worked for the other units, he put in a request to be assigned to the D unit to be with Ms. Curbelo. He again took on the

graveyard shifts to spend nighttime with Ms. Curbelo with little or no supervision from his colleagues.

113.    Other BOP personnel, including Ms. Curbelo's unit team and/or Officer Richardson, knew or should have known about Officer Hand's efforts to place himself in close proximity with Ms. Curbelo. He was continuously spending time with Ms. Curbelo in her cell, TV room, and other areas that were not captured by security cameras. Nonetheless, there was no intervention to correct or investigate this.

114.    In the D unit, Officer Hand continued to let Ms. Curbelo stay up past curfew to let her watch TV and/or interact with him. Officer Hand also began to bring Ms. Curbelo contraband, including but not limited to snacks that were not otherwise available at FCI Tallahassee.

115.    Other BOP personnel, including Ms. Curbelo's unit team and/or Officer Richardson who worked overlapping shifts as Officer Hand, with due diligence, should have noticed Officer Hand's preferential treatment towards Ms. Curbelo. They should have also noticed that Ms. Curbelo had routine access to things that she could only have received from an officer with outside contact. This type of favoritism is expressly prohibited by the BOP protocols and should have been immediately reported and investigated so that it would not progress further. Instead, Officer Hand had continued unfettered access to Ms. Curbelo.

116.    Officer Hand escalated his abuse to sexual assaults and rapes in the summer of 2021, while Ms. Curbelo was still housed in the D unit. Using his power and authority as a correctional officer, and emboldened by other BOP personnel's failure to stop him, Officer Hand forced himself upon Ms. Curbelo on four separate occasions between about June 2021 and August 2021.

117.    For the first assault, in or around June 2021, Officer Hand came into Ms. Curbelo's cell in the D unit at night, lifted her nightgown, and performed oral sex on her. He took advantage of the fact that Ms. Curbelo did not have a cellmate during this time.

118.    Upon information and belief, the RDAP program in the D unit is tightly controlled, and other BOP officers monitoring the unit including Officer Richardson should have noticed Officer Hand's behavior of entering a prisoner's cell during nighttime. This is a direct violation of BOP protocols where officers are never allowed to enter the cell while prisoners are inside, for the safety of both parties. Nonetheless, no BOP officer stopped or reported Officer Hand's misconduct. Indeed, when Officer Hatten would patrol the housing area where Ms. Curbelo's cell was located, other BOP officers like Officer Richardson would stay in the common area, giving them privacy.

119.    BOP officers, including Officer Richardson, violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR

§ 115.61, wherein all staff members must immediately report "any knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hand for his conduct.

120.    Officer Hand continued to escalate his assaults. For the second assault, in or around July 2021, on a weekend, Officer Hand intentionally allowed Ms. Curbelo to stay in the TV room late at night after all the other prisoners were locked into their cells to sleep. Around 3:00 AM count, Officer Hand came into the TV room and had vaginal intercourse with Ms. Curbelo for the first time.

121.    A prisoner violating the curfew and staying outside past the night count is a highly abnormal event. Even if the inside of TV room falls outside of the security camera view, it is impossible that all the other officers, including those monitoring the cameras, would have missed all the movements Ms. Curbelo had that night between her cell and the TV room and back. Officer Hand's suspicious interaction with Ms. Curbelo was apparent and obvious to any reasonable BOP officer who was overseeing the D unit and/or RDAP program. Nonetheless, Officer Hand continued to have daily access to Ms. Curbelo.

122.   Upon information and belief, there were several BOP officers who were tasked with monitoring the security cameras throughout FCI Tallahassee. Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hand spending so much time alone and off-camera with Ms. Curbelo. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hand's interactions with Ms. Curbelo. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

123.   For the third incident, in or around August 2021, Officer Hand again entered Ms. Curbelo's cell at night and performed oral sex on her. This time, he then left her cell to do a "round," which is a walk-through of the unit. About 30 minutes later, he came back to her cell, climbed on top of her on the bed, and had vaginal intercourse with her.

124.   The fourth and final assault occurred shortly thereafter, in or around August 2021, when Officer Hand again isolated Ms. Curbelo into the TV room. This time, Officer Hand had Ms. Curbelo perform oral sex on him and then vaginally raped her. Another prisoner saw this and reported it to the SIS.

125.    SIS Lieutenant Mason questioned Ms. Curbelo. At the time, Ms. Curbelo denied that anything had happened because she did not want to get in trouble, get kicked out of RDAP, and/or suffer retaliation from other officers. Officer Mason also told Ms. Curbelo that she would be put in the SHU for investigation if the allegations were true. This made Ms. Curbelo vehemently deny the allegations and beg him not to send her to the SHU. Officer Hand was transferred out of FCI Tallahassee about a week later and, upon information and belief, transferred to a male facility.

126.    During the few days that Officer Hand worked at FCI Tallahassee after the last rape was reported, he did not verbally speak with Ms. Curbelo. However, he snuck her a note, telling her to "keep your head up." This was his way of continuing to manipulate her, to ensure her silence. Even after Ms. Curbelo was released from FCI Tallahassee, Officer Hand attempted to remain in communication with her. However, he also told her that they could not speak on the phone because "the feds are watching," referring to the ongoing investigation.

127.    In total, between the four assaults, Officer Hand performed oral sex on Ms. Curbelo on two occasions, forced her to perform oral sex on him once, and vaginally raped her three times. The frequency and gravity of these assaults, all of which occurred in the housing unit that is required to be secure, can only be explained as a direct result of the negligence, gross negligence, carelessness,

recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

## OFFICER HATTEN's SEXUAL ABUSE OF PLAINTIFF

128.   Unfortunately, Ms. Curbelo's abuse did not end there as she was also assaulted by Officer Hatten. Around February or March of 2022, as she was nearing her graduation from the RDAP program, Ms. Curbelo began to interact frequently with Officer Hatten because she was employed as a clerk in the rec shack with Officer Hatten as her direct supervisor.

129.   Ms. Curbelo immediately noticed that Officer Hatten was overly friendly and flirtatious with many of the women who were working at rec. It did not take long for him to turn his attention to Ms. Curbelo and start making inappropriate comments to her in or around March 2022, for example comments about her body and what he would like to do to her. Ms. Curbelo did not want to resist him and get in trouble or get fired from her job. At the time, working at rec was one of the most desired positions at FCI Tallahassee because it was a way to spend more time outside of the housing unit during COVID-19.

130.   Notably, long before Ms. Curbelo began to work with Officer Hatten, in or around 2020, using COVID-19 pandemic to his advantage, Officer Hatten had begun to repeatedly spend time with certain women in the rec shack while other recreational officers were in upstairs rec, and vice versa. This was in violation of the

operating protocols under which at least two officers should have supervised women working recreation details. However, none of Officer Hatten's colleagues, including Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson, intervened to stop Officer Hatten's inappropriate conduct.

131.   Upon information and belief, around mid-2020, Officer Hatten began to lock certain women into the rec shack with an intent to abuse them there without interruption. This *modus operandi* continued undeterred up to his abuse of Ms. Curbelo and his eventual resignation in 2022. There were times when Officers Jones, Love, Mitchell, and Jackson, or their supervisor Officer Adamson would notice the rec shack door being locked. Even though they knew or should have known that Officer Hatten was there with a prisoner, they took no step to intervene or to protect the prisoner.

132.   Of note, even when Officer Hatten was assigned to upstairs rec, he would lock himself inside the rec shack with certain women, and the other rec officers, including Officer Love and Officer Jackson, would go to upstairs rec and informally swap posts with Officer Hatten. By such action, the other rec officers permitted, condoned, and/or acquiesced to his misconduct.

133.   Officers Adamson, Jones, Love, Mitchell, and Jackson violated their mandatory obligations under applicable BOP protocols as well as regulations including 28 CFR § 115.61, wherein all staff members must immediately report "any

knowledge, suspicion, or information regarding an incident of sexual abuse or sexual harassment that occurred in a facility." In the alternative, if these officers in fact reported their suspicion or knowledge pursuant to the regulations, the administrators who received the report failed to take appropriate action to immediately investigate and sanction Officer Hatten for his conduct.

134.    Emboldened by other BOP personnel's failure to stop him, with increasing fearlessness, Officer Hatten used the tools available to him through the BOP, such as access to prisoners, control over their jobs and livelihood, and blind spots from cameras, to violate and terrorize his victims, including Plaintiff Ms. Curbelo.

135.    Over time, Officer Hatten escalated what started as verbal harassment of Ms. Curbelo into physical contact with her. One day around March or April 2022, when Ms. Curbelo was working in the rec shack, Officer Hatten asked her for a hug, and during the hug, he touched her breasts and buttocks over her clothes. He also pressed his erection into her body and asked her if she could feel it.

136.    There were about five or six additional incidents between around March 2022 and July 2022, when Officer Hatten forcibly touched Ms. Curbelo's body in the rec shack. Sometimes he would slap Ms. Curbelo's buttocks. Sometimes he would grab or rub Ms. Curbelo's buttocks, thigh, and/or breasts. Ms. Curbelo felt

uncomfortable but did not feel that she could speak up against an officer, especially as he was her supervisor for the rec clerk position that she wanted to keep.

137.   In or around June 2022, Officer Hatten further escalated his sexual abuse when he locked the door to the rec shack when Ms. Curbelo and he were the only people inside. He again touched her buttocks and breasts over her clothes, but this time, proceeded to put his hand under her clothes and grope her vagina.

138.   Officer Hatten took every opportunity to spend time alone with Ms. Curbelo behind locked door in the rec shack. There were no security cameras that captured the inside of the rec shack. Nonetheless, BOP staff exercised no effort to investigate or stop Officer Hatten's suspicious conduct.

139.   On or around July 4, 2022, when Officer Hatten and Ms. Curbelo were again alone in the rec shack, Officer Hatten locked the door, put his hand on her body and inside her pants, and penetrated her vagina with his finger.

140.   After this last incident, Ms. Curbelo told Officer Hatten that he had gone too far and needed to stop. Officer Hatten appeared angry and shocked. He refused to stop his sexual advances and inappropriate comments towards Ms. Curbelo, despite her pleas. Instead, he began to make explicit threats to Ms. Curbelo, saying that if she resisted him, he would fire her from her position.

141.   Throughout the time that Ms. Curbelo was employed as a clerk in the rec shack, Officer Hatten would periodically come to her housing unit and scream

her name to take her to work. He would say things like, "If I have to continue to come look for you, I'm going to have to let you go," and "You know you can be replaced." Despite Officer Hatten's apparent and abnormal conduct, BOP staff, including Ms. Curbelo's unit team, did nothing to report or stop his interactions with Ms. Curbelo.

142.   Ms. Curbelo knew that she would be placed in the SHU and/or lose her job if she were to report Officer Hatten's sexual assaults. Ms. Curbelo only escaped Officer Hatten's predation because one of his other victims, Ms. Hernandez, reported his rape to prison officials in or around August 2022. Ms. Hernandez was indeed put in the SHU after this report, which confirmed Ms. Curbelo's knowledge and suspicion that she could not safely report officers' sexual abuse at FCI Tallahassee.

143.   Shortly after Ms. Hernandez's report, Officer Hatten resigned from his employment and did not return to FCI Tallahassee. Nonetheless, Ms. Curbelo did not feel that she could report either Officer Hand or Officer Hatten's assaults except through counsel after her release from BOP custody in or around December 2022. After reporting the assaults to the BOP by filing the torts claim form in or around April 2023, Ms. Curbelo has not been given any information regarding what if any investigation has been conducted regarding her assaults.

144.   Consistent with his *modus operandi*, Officer Hatten habitually took advantage of his institutional power, knowledge, and resources to isolate Ms.

Curbelo in an off-camera area without interruption. There were no security cameras that captured the inside of the rec shack where the assaults occurred.

145.   Incarcerated people are not allowed to be alone in an off-camera area with an officer. Therefore, the BOP officers who were monitoring the security cameras were, and/or should have been, suspicious of Officer Hatten spending time alone and off-camera with Ms. Curbelo. Nonetheless, no BOP personnel came to investigate, intervene, or inquire as to Officer Hatten's interactions with Ms. Curbelo. This failure cannot be explained without deliberate indifference, recklessness, and carelessness of the Defendant United States and its agents, servants, contractors, and employees towards the risk of sexual abuse that incarcerated women face.

146.   The repeated horrors that Officer Hatten inflicted on the Plaintiff occurred only as a direct result of the negligence, gross negligence, carelessness, recklessness, and deliberate indifference of numerous BOP officials, up and down the chain of command.

## AFTERMATH OF SEXUAL ABUSE

147.   During the two years that she was incarcerated at FCI Tallahassee, Ms. Curbelo suffered repeated sexual assaults, abuse, and harassment by two different correctional officers who were entrusted with her safety and health.

148.    Throughout relevant times, Defendant United States' agents, servants, contractors, and employees at FCI Tallahassee, including but not limited to Officers Richardson, Jones, Love, Mitchell, Jackson, and/or Adamson, were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed to the Plaintiff Ms. Curbelo's safety under Officer Hand and/or Officer Hatten's purported custodial, supervisory, and disciplinary care. Nonetheless, they took no steps to keep the Plaintiff safe from Officer Hand and/or Officer Hatten, in violation of mandatory BOP policies and federal regulations.

149.    Defendant United States' agents, servants, contractors, and employees knew or should have known of the substantial problems and shortcomings at FCI Tallahassee: in the training that staff receive regarding sexual abuse; the glaring lack of security cameras in certain locations of the facility; the system for reporting sexual abuse complaints; the treatment of victims who reported sexual abuse; the oversight of the sexual abuse prevention program; the actual violations of BOP security and operating protocols including by Officer Hand and/or Officer Hatten; and their propensity in engaging in sexually inappropriate and abusive behavior. Defendant United States and its agents, servants, contractors, and employees took no reasonable steps to remedy these issues and instead assumed and/or acquiesced in the risk of injuring victims such as the Plaintiff, demonstrating a plain disregard of an excessive risk to her safety and welfare.

150.    Even though she was released from BOP custody in or around December 2022, to this day, Ms. Curbelo is continuing to suffer the consequences of her victimization by Officer Hand and Officer Hatten. She has had to take medications like Zoloft, Prozac, and Remeron for her depression and sleep difficulties. She has been diagnosed with complex PTSD, depression, and anxiety, with feelings of distrust, helplessness, as well as suicidal thoughts and extreme hypervigilance. She finds herself struggling with daily functioning, and constantly questioning the motives of those around her. She received some therapy and found it to be helpful.

151.    As a result of the foregoing, Ms. Curbelo continues to suffer from debilitating psychological trauma, permanent and catastrophic psychological injuries, severe emotional distress, permanent physical ailments associated with psychological injuries, pain, humiliation, loss of enjoyment of life, and loss of quality of life. These injuries are expected to be permanent. Ms. Curbelo also suffers from other permanent injuries and deficits that will be established through expert consultation in this litigation.

152.    Upon information and belief, Ms. Curbelo will require sustained, long-term intensive psychiatric and/or psychological treatment with appropriate qualified experts. Even with such professional treatment, it is expected that Plaintiff's injuries and damages are permanent and will continue to severely impact her health, welfare,

and daily functioning. To the extent that she suffered sexual victimization prior to incarceration, Plaintiff's psychological trauma and the resulting impairment were exacerbated because of Officer Hand and/or Officer Hatten's assaults.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### NEGLIGENCE CLAIM UNDER FEDERAL TORT CLAIMS ACT
### (Against Defendant United States)

153.  Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 1 through 152 with the same force and effect as if fully set forth herein.

*United States' liability for the acts and omissions of its employees*

154.  At all relevant times, Defendant United States hired various correctional and/or administrative personnel at FCI Tallahassee, including Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, as well as Officer Hand and/or Officer Hatten's other colleagues and/or supervisors whose identity is currently unknown to the Plaintiff. Within the scope of their employment, these individuals were tasked to and did provide custodial care, control, and supervision to people incarcerated at FCI Tallahassee, including but not limited to the Plaintiff Ms. Curbelo.

155.  At all relevant times, FCI Tallahassee personnel including Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and Officer Adamson held themselves out to persons incarcerated at FCI Tallahassee,

and in particular to Plaintiff, as correctional and/or administrative personnel with the knowledge, capacity, and ability to provide due care in accordance with standards of reasonable care common and acceptable in the community.

156. At all relevant times, FCI Tallahassee personnel including Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, within the scope of their employment with the United States, owed a non-delegable duty of care to Plaintiff while she was housed at FCI Tallahassee.

157. It was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that correctional and/or administrative personnel with a history of sexual assaults were not allowed to harm or injure other incarcerated people.

158. It was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to use reasonable care for the safety of incarcerated individuals within their custodies.

159. It was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to maintain, operate,

and control FCI Tallahassee as a safe and secure space for persons in it, including but not limited to Plaintiff.

160.   It was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to provide adequate custody, control, supervision, and monitoring to persons at FCI Tallahassee, including but not limited to Plaintiff.

161.   It was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to adequately protect incarcerated people including Plaintiff from the foreseeable harm inflicted by BOP personnel known to be dangerous, including Officer Hand and/or Officer Hatten.

162.   As described in paragraphs 66, 72, 75, 81-85, 95, 119, and 133, it was the duty of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson as federal employees, while acting within the scope of their office or employment, to ensure that any suspicion or indication of sexual abuse was reported through the chain of command for full investigation. Such suspicion or indication of sexual abuse would include Officer Hand and/or Officer Hatten's suspicious conduct as described in paragraphs 5-6, 12, 14, 17, 25, 121, 131, and 138; their respective violation of the operating protocols and/or rules

as described in paragraphs 7, 13, 26, 58-59, 61, 68-69, 109, and 130; and their respective provision of contraband and/or other benefits to their victims including Ms. Curbelo as described in paragraphs 27, 65, 73, 110, and 114-115.

163.  It was the duty of Officer Adamson and other supervisory officers whose identity is currently unknown to the Plaintiff, as federal employees, while acting within the scope of their office or employment, to ensure that all BOP employees are trained, supervised, and monitored properly.

164.  As described in paragraphs 7, 26, 63, 71, 122, and 144-145, it was the duty of certain supervisory and/or administrative staff whose identity is currently unknown to the Plaintiff, as federal employees, while acting within the scope of their office or employment, to ensure that security cameras are installed, monitored, and attended to throughout FCI Tallahassee, such that sexual assaults described herein would not occur under their watch.

165.  Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, as federal employees and while acting within the scope of their office or employment, breached each of the foregoing duties in paragraphs 154 through 164 that they owed to Plaintiff by failing to take adequate steps to protect her from Officer Hand and/or Officer Hatten promptly, despite the numerous warning signs and indications of sexual abuse presented by Officer Hand and/or Officer Hatten. To the extent that any other correctional, supervisory, and/or

administrative staff of FCI Tallahassee, such as Ms. Curbelo's unit team (see paragraphs 7, 19, 64, 73, 107, 113, 118, and 141), or special investigative agents (see paragraphs 8 and 125), were aware of Officer Hand and/or Officer Hatten's sexually abusive conduct and turned a blind eye to it, they also breached the duties owed to the Plaintiff by failing to take adequate steps to protect her from Officer Hand and/or Officer Hatten promptly.

166.   The breach by federal employees described in paragraph 165 directly exposed Plaintiff to an unreasonable risk of bodily injury, causing her to fear for her life and safety, and resulted in her being assaulted by Officer Hand and/or Officer Hatten as described above.

167.   Officer Richardson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hand was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

168.   Officer Richardson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hand had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and acting as the lone correctional officer in the housing unit during the night shift, the history of staff sexual abuse at FCI

Tallahassee with similar *modus operandi* as that of Officer Hand, and/or prior reports or allegations made against Officer Hand.

169.   Officer Richardson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hand. As described in paragraphs 66, 107, 113, 115, 118, and 141, Officer Richardson observed that Officer Hand was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

170.   Officer Richardson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hand's sexually abusive behavior.

171.   Despite actual and constructive notice of Officer Hand's abuse, Officer Richardson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hand to repeatedly prey upon the Plaintiff without any restraints or supervision.

172.   Despite actual and constructive notice of Officer Hand's abuse, Officer Richardson, as a federal employee and while acting within the scope of his

employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

173.   Officer Richardson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hand's recurrent sexual abuse. He enabled and acquiesced in Officer Hand's conduct, thereby placing Plaintiff directly in harm's way.

174.   Officer Richardson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hand, allowing him to operate within FCI Tallahassee with impunity.

175.   In each of the foregoing ways as alleged in paragraphs 167 through 174, Officer Richardson did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

176.   In each of the foregoing ways as alleged in paragraphs 167 through 174, Officer Richardson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

177.    In each of the foregoing ways as alleged in paragraphs 167 through 174, Officer Richardson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

178.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

179.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

180.    Officer Jones, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 17, 75-76, 95, and 130-131, Officer Jones observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such

that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

181.   Officer Jones, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

182.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

183.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jones, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

184.   Officer Jones, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

185.    Officer Jones, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

186.    In each of the foregoing ways as alleged in paragraphs 178 through 185, Officer Jones did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

187.    In each of the foregoing ways as alleged in paragraphs 178 through 185, Officer Jones, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

188.    In each of the foregoing ways as alleged in paragraphs 178 through 185, Officer Jones, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

189.    Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

190.    Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP

policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

191.   Officer Love, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 17, 75, 77, 95, and 130-132, Officer Love observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

192.   Officer Love, as a federal employee and while acting within the scope of his employment, knew that there were prior incidents at FCI Tallahassee where officers sexually abused prisoners with similar *modus operandi* as Officer Hatten's, and yet ignored the blatant suspicions and/or indications of Hatten's sexual abuse.

193.   Officer Love, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

194.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his

employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

195. Despite actual and constructive notice of Officer Hatten's abuse, Officer Love, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

196. Officer Love, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

197. Officer Love, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

198. In each of the foregoing ways as alleged in paragraphs 189 through 197, Officer Love did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

199.   In each of the foregoing ways as alleged in paragraphs 189 through 197, Officer Love, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

200.   In each of the foregoing ways as alleged in paragraphs 189 through 197, Officer Love, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

201.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

202.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

203.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive

risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 17, 75, 78, 95, and 130-131, Officer Mitchell observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

204.  Officer Mitchell, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

205.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

206.  Despite actual and constructive notice of Officer Hatten's abuse, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

207.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

208.   Officer Mitchell, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

209.   In each of the foregoing ways as alleged in paragraphs 201 through 208, Officer Mitchell did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

210.   In each of the foregoing ways as alleged in paragraphs 201 through 208, Officer Mitchell, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

211.   In each of the foregoing ways as alleged in paragraphs 201 through 208, Officer Mitchell, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

212.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten was likely

to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

213.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

214.   Officer Jackson, as a federal employee and while acting within the scope of her employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 17, 75, 79, 95, and 130-132, Officer Jackson observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that she knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet she did not do so.

215.   Officer Jackson, as a federal employee and while acting within the scope of her employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

216.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

217.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

218.   Officer Jackson, as a federal employee and while acting within the scope of her employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. She enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

219.   Officer Jackson, as a federal employee and while acting within the scope of her employment, negligently failed to adequately monitor, supervise,

investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

220.  In each of the foregoing ways as alleged in paragraphs 212 through 219, Officer Jackson did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

221.  In each of the foregoing ways as alleged in paragraphs 212 through 219, Officer Jackson, as a federal employee and while acting within the scope of her employment, neglected to apply the skill she did have.

222.  In each of the foregoing ways as alleged in paragraphs 212 through 219, Officer Jackson, as a federal employee and while acting within the scope of her employment, did not use reasonable care in applying the skill she had.

223.  Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten was likely to engage in criminal conduct that injured Plaintiff and other people incarcerated at FCI Tallahassee.

224.  Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that Officer Hatten had a propensity to sexually abuse prisoners because of his suspicious practices that violated BOP policies or federal regulations, including his pattern of spending time in off-camera spaces alone with prisoners and locking them into the rec shack with

him, the history of staff sexual abuse at FCI Tallahassee with similar *modus operandi* as that of Officer Hatten, and/or prior reports or allegations made against Officer Hatten.

225.   Officer Adamson, as a federal employee and while acting within the scope of his employment, knew or should have known that there was an excessive risk that prisoners, and Plaintiff in particular, would be sexually assaulted by Officer Hatten. As described in paragraphs 17, 75, 80, 95, and 130-131, Officer Adamson observed that Officer Hatten was interacting and meeting with Plaintiff in an unusual manner, such that he knew or should have known to report the behavior, investigate further, and/or otherwise intervene to prevent any further sexual abuse, and yet he did not do so.

226.   Officer Adamson, as a federal employee and while acting within the scope of his employment, disregarded, or ignored numerous warning signs, indications, and complaints regarding Officer Hatten's sexually abusive behavior.

227.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, failed to take reasonable measures to provide Plaintiff with a reasonably safe environment, and instead allowed Officer Hatten to repeatedly prey upon the Plaintiff without any restraints or supervision.

228.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as Officer Hatten's direct supervisor, allowed him unfettered access to his victims under the pretext of supervising female prisoners working in recreation.

229.   Despite actual and constructive notice of Officer Hatten's abuse, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not take reasonable, available measures to abate the risk of sexual abuse to Plaintiff, and to ensure her safety, in violation of federal regulations and BOP protocols.

230.   Officer Adamson, as a federal employee and while acting within the scope of his employment, assisted in creating and increasing the danger to Plaintiff by enabling, permitting, condoning, tolerating, and failing to prevent Officer Hatten's recurrent sexual abuse. He enabled and acquiesced in Officer Hatten's conduct, thereby placing Plaintiff directly in harm's way.

231.   Officer Adamson, as a federal employee and while acting within the scope of his employment, negligently failed to adequately monitor, supervise, investigate, or discipline Officer Hatten, allowing him to operate within FCI Tallahassee with impunity.

232.    In each of the foregoing ways as alleged in paragraphs 223 through 231, Officer Adamson did not possess the necessary skill to maintain a safe and secure environment and protect Plaintiff from foreseeable harm.

233.    In each of the foregoing ways as alleged in paragraphs 223 through 231, Officer Adamson, as a federal employee and while acting within the scope of his employment, neglected to apply the skill he did have.

234.    In each of the foregoing ways as alleged in paragraphs 223 through 231, Officer Adamson, as a federal employee and while acting within the scope of his employment, did not use reasonable care in applying the skill he had.

235.    United States is the sole proper defendant for each breach of duty by federal employees, Officers Richardson, Jones, Love, Mitchell, Jackson, and/or Adamson alleged in foregoing paragraphs 156 through 234 under the FTCA. United States is vicariously liable for the acts or omissions of its agents, servants, contractors, and/or employees that occur within the scope of their employment as here.

236.    Plaintiff's injuries herein were proximately caused by the carelessness, recklessness, gross negligence, negligence, and deliberate indifference of United States' employees including Officers Richardson, Jones, Love, Mitchell, Jackson, and/or Adamson, who were on duty and acting within the scope of their employment when they engaged in the wrongful conduct described herein.

237. Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's employment at FCI Tallahassee was essential to their commission of tortious misconduct, which could not have occurred absent their federal employment and related privileges.

238. Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson's conduct was grossly negligent in that they were so careless as to show complete disregard for the rights and safety of Plaintiff.

239. Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson were aware of facts that gave rise to an unreasonable risk that Plaintiff would be irreparably injured.

240. It was foreseeable to Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, based on the facts known to them, that Plaintiff was at risk of imminent serious harm including sexual abuse.

241. Yet, Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson in their official capacities failed and/or refused to prevent the abuse of Plaintiff or to prevent its psychological consequences from worsening to the extent that they did.

242. Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, acting as agents, servants, contractors,

and/or employees of the United States, knew that they had an opportunity to intervene and prevent the exacerbation of Plaintiff's injuries and damages, and yet did not do so and instead inflicted unnecessary pain and suffering.

243.    The failure of FCI Tallahassee personnel, namely Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson to prevent, investigate, or acknowledge Officer Hand and/or Officer Hatten's sexual abuse of prisoners, including Plaintiff, served no legitimate policy purpose. On the contrary, FCI Tallahassee staff were required by mandatory BOP policies and federal regulations to immediately intervene and investigate when they learned of his suspected sexual abuse. The failure to do so by Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, Officer Adamson, and/or other personnel currently unknown to Plaintiff, was patently outside of their discretionary function.

*United States' liability for its own acts and omissions*

244.    Defendant United States also had independent duty owed to the Plaintiff to adequately protect people incarcerated in its custody and to exercise due diligence in hiring, training, retaining, and supervising its employees.

245.    Defendant United States failed abjectly in its duty to detect, prevent, and investigate sexual abuse in its facility (see paragraphs 87 and 97-100), to safeguard its prisoners from its own employees (see paragraphs 86, 92, 96, 103, 105,

125, and 127), to protect them from retaliation (see paragraphs 8, 24, and 142), and to provide a reliable, confidential reporting mechanism (see paragraphs 15 and 148).

246.  Defendant United States failed to provide a reasonably safe environment to Plaintiff, who was under its care, custody, and control without ability to escape.

247.  Plaintiff' injuries were direct and proximate consequences of Defendant United States' (a) failure to enforce zero-tolerance policy against sexually abusive conduct, 28 C.F.R. § 115.11; (b) failure to supervise, monitor, and surveil one-on-one physical contact between BOP personnel and incarcerated persons, 28 C.F.R. § 115.13; (c) decision to hire, retain, and promote BOP personnel who was suspected or alleged to have had improper sexual contact, 28 C.F.R. § 115.17; (d) punishment of victims through disciplinary or retaliatory measures instead of providing proper support and protection, 28 C.F.R. § 115.43; (e) failure to report suspicion or allegation of sexual abuse, 28 C.F.R. § 115.61, Program Statement 5324.12; (f) failure to protect victims from retaliation after reporting sexual abuse, 28 C.F.R. § 115.67; (g) failure to promptly, thoroughly, and objectively investigate all allegations or reports, 28 C.F.R. § 115.71(a), Program Statement 3420.11; and (h) failure to discipline staff for sexual misconduct, 28 C.F.R. § 115.76.

248.  Despite actual and constructive notice of Officer Hand and/or Officer Hatten's abuse, Defendant United States acted negligently in improperly hiring,

training, retaining, supervising, and/or disciplining Officer Hand and/or Officer Hatten as described in paragraphs 9, 25, 68, 92, and 125.

249.   Despite actual and constructive notice of Officer Hand and/or Officer Hatten's abuse, Defendant United States acted negligently in failing to adequately monitor, supervise, investigate, or discipline Officer Hand and/or Officer Hatten, allowing each of them to operate with impunity.

250.   Defendant United States acted negligently in hiring Officer Hand and/or Officer Hatten, as well as Officers Richardson, Jones, Love, Mitchell, Jackson, and/or Adamson, who did not possess the necessary skill to maintain safe and secure environment and protect Plaintiff from foreseeable harm.

251.   Even though the United States' hiring, retention, and promotion of its employees are sometimes considered discretionary, when, as here, the United States was aware of its employees' tortious conduct, ignored and assisted in it, its retention of those employees does not represent a choice based on legitimate policy considerations.

252.   United States' acts and omissions as described in paragraphs 244 through 250 proximately caused Plaintiff's injuries.

*Summary*

253.    The above-described acts and omissions of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, and the United States constitute the tort of negligence under the laws of the State of Florida.

254.    Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Curbelo in accordance with the laws of Florida, for the negligence upon Ms. Curbelo.

255.    Plaintiff's injuries were inflicted through no fault or want of care or contributory negligence on the part of Plaintiff.

256.    Officer Hand and/or Officer Hatten's recurrent sexual assaults of Ms. Curbelo meet Florida state's requirements for physical impact.

257.    As a direct and proximate result of the foregoing, Plaintiff Ms. Curbelo suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

258.   As a direct and proximate result of the foregoing, Ms. Curbelo has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

<u>**SECOND CLAIM FOR RELIEF**</u>

**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM
UNDER FEDERAL TORT CLAIMS ACT
(Against Defendant United States)**

259.   Plaintiff hereby repeats, reiterates, and incorporates by reference paragraphs 1 through 258 with the same force and effect as if fully set forth herein.

260.   As described in paragraphs 153 through 258, Defendant United States, individually or through Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, in their official roles and capacities as agents, servants, contractors, and/or employees, directly caused, or disregarded a substantial probability of causing, severe emotional distress and mental injury to Plaintiff.

261.   The acts and omissions of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson, described in paragraphs 153 through 258, constituted extreme and outrageous conduct.

262.   Plaintiff in fact suffered debilitating emotional suffering.

263.    The above-described acts and omissions of Officer Richardson, Officer Jones, Officer Love, Officer Mitchell, Officer Jackson, and/or Officer Adamson constitute the tort of negligent infliction of emotional distress under the laws of the State of Florida.

264.    Florida state law only recognizes this tort if it meets the requirements under the impact rule, which requires either physical touch or a physical manifestation of emotional distress. The "touch" requirement can be met with a foreign object, such as a gun or by a perpetrator's hands. Therefore, even without a physical manifestation of emotional harm, the Court can make a finding of negligent infliction of emotional distress. *See Willis v. Gami Golden Glades, LLC*, 967 So. 2d 846 (Fla. 2007).

265.    Here, Officer Hand as well as Officer Hatten repeatedly sexually abused Plaintiff, meeting the requirement of both physical touch and physical manifestation of emotional distress. Officer Hand and Officer Hatten's respective sexual abuse of Plaintiff was severe and repetitive, and caused Plaintiff physical pain and extreme emotional trauma.

266.    Under the FTCA, Defendant United States of America is liable for the acts and omissions of its agents, servants, contractors, and/or employees that occurred within the scope of their employment as here.

267.   Based on the foregoing circumstances, the United States, if it were a private person, would be liable to Plaintiff Ms. Curbelo in accordance with the laws of Florida, for the negligent infliction of emotional distress upon Ms. Curbelo.

268.   As a direct and proximate result of the foregoing, Plaintiff Ms. Curbelo suffered debilitating psychological trauma, excruciating pain and suffering, emotional distress, permanent and catastrophic psychological injuries, permanent physical ailments associated with psychological injuries, humiliation, fear, depression, anxiety, frustration, loss of enjoyment and pleasures of life, loss of quality of life, and offenses to her personal dignity, as well as attendant damages, both general and special, including but not limited to any past and future medical expenses and economic injuries.

269.   As a direct and proximate result of the foregoing, Plaintiff has suffered serious harm including, without limitation, physical, psychological, emotional, mental, financial, and reputational harm, and therefore, Ms. Curbelo is entitled to recover damages in an amount to be determined at trial.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Sonia Curbelo respectfully requests that judgment be entered against Defendant United States, and that this Court grant the following to the Plaintiff:

1.    An award of compensatory damages for all injuries caused by the Defendant, including psychological and personal injuries, pain and suffering, emotional distress, humiliation, physical injuries, loss of enjoyment of life, loss of quality of life, and mental, financial, economic, and reputational damages, both past and future, general and special, and other harm, in an amount to be determined at trial;

2.    An award of pre- and post-judgment interest to the fullest extent permitted by law, for any and all monetary and/or non-monetary losses;

3.    An award of reasonable costs of suit and litigation expenses to the fullest extent permitted by law;

4.    An award of reasonable attorneys' fees to the fullest extent permitted by law; together with

5.    Such other and further relief at law or in equity as this Court may deem just and proper.

_S/ Jaehyun Oh_
**JAEHYUN OH***
The Jacob D. Fuchsberg Law Firm, LLP
3 Park Avenue, 37th Floor,
New York, NY 10016
New York Bar No. 5668512
Tel: (212) 869-3500 Ext. 245
j.oh@fuchsberg.com
_Attorney for Plaintiff_
(* _Pro Hac Vice_ Application
Forthcoming)

_S/ Whitney Marie Untiedt_
**WHITNEY MARIE UNTIEDT**
Untiedt Dabdoub, PLLC
1600 Ponce De Leon Blvd., 10th Floor,
Coral Gables, FL 33134
Florida Bar No. 15819
Tel: (305) 330-2397
whitney@udlawyers.com
_Attorney for Plaintiff_